Good morning, Your Honors. May it please the Court and Ms. Jason. My name is Tim Gabrielson. I'm from the Federal Public Defender's Office in Tucson, and I represent Darrel Lee in this appeal of the denial of federal habeas corpus relief. The issue before the Court today, the issues are largely procedural, but I think before I even sort of get to them, the question is whether the District Court abused its discretion in failing to order an evidentiary hearing in this matter, and it was in a slightly different context. It was in the Martinez remand litigation, and an issue has arisen, a procedural issue, that opposing counsel brought to light in her brief and in the motion practice that preceded my filing the replacement opening brief, and that is, by staking out a Martinez claim, did Mr. Lee somehow forfeit a right to present evidence, as we briefed, that appointed State Post-Conviction Counsel performed reasonably diligently in trying to unearth the facts in the State Court proceeding at the evidentiary hearing that the Court in La Paz County, Arizona, ordered, or are we somehow stuck with that original Martinez remand? And I just want to touch on this briefly. I mean, I think we aired this in the motion practice when I moved to file a replacement opening brief, when I suggested that there were other legal avenues for Mr. Lee to employ to get his claims before this Court and to be able to request an evidentiary hearing on his ineffective assistance of trial counsel claim. But I feel like, because it's an opposing counsel's brief, I'm just going to take a minute to remind the Court that when Martinez was decided in 2012, the Ninth Circuit stayed, I think, a couple of dozen federal habeas corpus cases. At least 10 or 12 of those cases were capital cases in my office. So they were in mid-stage of the Ninth Circuit appeals process. And this Court stayed those appeals and remanded to the District Court, where my office made arguments that we might benefit from Martinez being able to show that State Post-Conviction Counsel rendered ineffective assistance under Strickland v. Washington, and that would serve as cause and prejudice to excuse the failure of Post-Conviction Counsel to exhaust ineffective assistance of trial counsel claims in the State Post-Conviction process. So this Court recognized back then that a sea change in the law, which Martinez was, because for 30 years there was no such thing as ineffective assistance of Post-Conviction Counsel going back to a case called Coleman v. Thompson. And then in 2012, the U.S. Supreme Court said, not as a constitutional matter, but as an equitable principle, it would allow habeas petitioners to go back to State Court and allege that their State Post-Conviction Counsel didn't do what they were supposed to do, didn't preserve their rights, didn't properly represent them. So, Counsel, you're correct that there's been a couple of changes in the law, but the fact remains that in the District Court, and even in this Court when you filed your initial briefs, you made some representations about State Post-Conviction Counsel, and namely that he was deficient and did not perform diligently. Why, I mean, obviously in light of what we now know from the Supreme Court, that was not the best strategy to pursue, but why are you not bound by the representations you made? I think based on the record as it presently rests, Your Honor, I think that this Court can go ahead and look at the arguments that we've made with respect to State Post-Conviction Counsel actually performing reasonably diligently. Yes, there were some faults in what Matt Newman did or failed to do, and our claim to in our brief speaks to something that was in his file that he didn't see. But I think in fairness to Mr. Lee, and because of the change in the law, I probably have taken a deep, well, I did take a deeper dive into what the judge said to Mr. Lee's case after it was already in the Ninth Circuit, and that Martinez's decision came out. It looked like that was the straightforward path to trying to get relief because this Court announced an en banc decision in Dickens v. Ryan, which sort of was a template that has been used repeatedly, not only in our briefing in these cases, but also the decisions of this Court, and also the decision in Dietrich v. Ryan, which I think Judge Fletcher wrote the en banc plurality opinion in, which also set forth great guideposts for us to follow in trying to get to the point where we could present these claims, but also the new evidence in support of these claims in federal court for the first time. And so the decision in Dietrich v. Ryan, which was a sea change in the law, just as Martinez was, we left on the table, when we filed the Martinez brief initially, we left on the table other legal vehicles that we thought we could employ on Mr. Lee's behalf. It was not appropriate to sort of brief those simultaneously with the Martinez briefing. I appreciate that, but it's not so much that this claim is forfeited in the sense that you just didn't make it before. It's that it contradicts the claim that you did make, right? That seems to me potentially different and perhaps harder to overcome, isn't it? I think the distinction I would draw, Your Honor, is the district court back in 2010, before we even got to Martinez, when the court issued its first memorandum of decision in this case, talked about how it was really the defect and the illness of the mitigation specialist that the La Paz County judge appointed Mary Duran to do the mitigation investigation that would support these claims. The district court equated the facts, and he repeatedly went to court for a year and a half and told the judge, I can't prove my ineffective assistance claim because I need a thorough social history. I have to be able to produce that to the mental health experts, and I can't do that as long as Ms. Duran has not completed her work. So the district court said, I equate the failures of that mitigation specialist with the failures of a post-conviction counsel. If the mitigation specialist couldn't complete her work, then counsel was duty-bound to do that. I think that a deeper reading, and I apologize, I should apologize to my client. I think a deeper dive on my part saw that in the Michael Williams case in the U.S. Supreme Court, there's a discussion about how that opening clause of section 2254E2 that bars evidentiary development, evidentiary hearings, where the petitioner lacked diligence. There's language in there that I should have been more careful about observing, I think, back in the day that says that if somebody else is responsible for PCR counsel's failure to develop those facts, or if it's by sheer happenstance, those are things that remove the case from 2254E2's restrictions and allows evidentiary development in federal court. And I think, as you see in our briefing, that's what we lean on most heavily now. But then what do we do with the fact that PCR counsel himself said, and this is at the hearing when he sought the final continuance, the one that wasn't granted, it's my fault. I should have stayed on top of Mary Duran better, and I didn't. Was he wrong about that? Well, actually, I think he was wrong, Your Honor, in this sense, because he went, as our briefing makes clear, he had selected, he did his diligence, and he selected a mitigation specialist named Roseanne Shea from Tucson, a very experienced, gifted woman who actually did pro bono work on this case with the anticipation that she might get an appointment to work the case with Mr. Newman. So the court in La Paz County, Arizona, which is right on the California-Arizona border, it's a rural county, the judge said, that's going to be too expensive to pay this woman to commute from Tucson to Phoenix to do her mitigation investigation. I want to appoint somebody that is from Phoenix. And so the court called the Maricopa County Superior Court and talked to a guy named Jonathan Bass, who later worked for opposing counsel's office, but he was the capital case coordinator for Maricopa County at the time. He put out two names to the judge and said, these are two people in Phoenix that you could pick from. And the judge selected Mary Duran, but that was not Matt Newman's choice to take Mary Duran. He did his diligence. He wanted Roseanne Shea. But from that point forward, he continuously asked the court. He was working hand-in-glove with Can I follow up with you on that? My understanding was that it wasn't the person that Newman put forward, but when the judge picked Mary Duran, Newman didn't dispute that, right? Did he say it was great or fine? I can't remember. But didn't he acquiesce in the that the capital representation project suggested to Mr. Newman? At the time that Ms. Duran was chosen, not as things develop and she has illness and so on, but at the time she was chosen in this case, what was her reputation? Her reputation was good, but as she told Judge Irwin, who appointed her, I'm the mitigation coordinator for the Maricopa County Superior Court. She had around 15 capital cases she was working on. And she had a private practice doing mitigation development that she called in the outlying counties, so counties outside of Maricopa. She told Judge Irwin right up front, this is going to be difficult for me because I'm overburdened. And Judge Fletcher, that was before she became ill, before she was infected by the mold infestation in her house that caused her to be hospitalized somewhere around five times, I think is what she reported to Matt Newman and he told the judge. But she ended up with pneumonia and was hospitalized I think around five times in about an eight or ten month period until she sold her home and moved out and got on a road to recovery. But by that time, as she testified I think at the evidentiary hearing, her caseload at that point was up to about 30 cases. I think probably due because of her inactivity for a period of time. So she was still a Maricopa County mitigation specialist. What would have been available, do you think, if Mr. Lee's counsel had said at some point, you know, it's not worth waiting for Ms. Duran to get any better because this is going to drag on? Do we have any indication whether the judge would have agreed to that? Well, Judge, at a hearing, and it's in our brief, Judge Irwin said to Mr. Newman at an in-court hearing, he said, what's her status? I mean, is this how fast she's going to recover from this? And the judge said, it's probably going to take more time to get another mitigation specialist up to speed on this. I think we'll just go ahead and keep Ms. Duran on the case. And so that's what Judge Irwin contemplated was. I remember reading that. What point was that in the, it was about a two year period of time here. What point was that? It was about a year and a half in, Your Honor. Six months before they finally stopped granting. Yeah. In fact, on September 28th of 2001, Judge Irwin had retired a month earlier and a retired judge from Phoenix named Richard Schaefer comes into the case. And at the very first hearing in court, he announces to Matt Newman, with regard to any future extensions of time, he said, you already have two years to educate Judge Schaefer and said, well, I've got a mitigation specialist who's critical. And he stood up, as you know, Your Honors, Matt Newman stood up in open court at that evidentiary hearing and put in his post-hearing memo. I can't prove the prejudice prong of Strickland because I don't have evidence because Ms. Duran hasn't done her work. So Judge Schaefer came in initially telling Matt Newman, no more time. The matter was set for an evidentiary hearing in November of 2001. When Matt Newman came back in and asked for an extension of time, the judge would not give him the extension, but further denied. He had a request for funds for an investigator to try to take some of the burden off Ms. Duran. And we cite in our brief to the case that Your Honors decided some years back called Liberton, an Arizona death penalty case. At that point, I think that appointment of an investigator might have helped Matt Newman sort of get over the problem of Ms. Duran not finishing her work. So what happens is the matter gets continued to January of 2002. Mary Duran is still not prepared. And Matt Newman goes to Judge Schaefer and says, I need that extension of time. And he says, no. Matt Newman goes to the extraordinary step, and I think this is extraordinary diligence. He files a special action with the Arizona Supreme Court to try to get the court to micromanage the discovery and the evidentiary hearing schedule for a case in the Superior Court of La Paz County. And the Arizona Supreme Court declines jurisdiction over the special action, but for some reason goes ahead and enters an order that pushes the case to April of 2002. So did he try to overcome her illness and catch up? No. He still tried to As I understood it, reading all this and what you're saying today, he kept, he did, he was asking for extensions. But I think this goes to maybe the same, similar question to what Judge Fletcher was asking. At what point does he have a responsibility to say, we need to get somebody different, as opposed to just saying, we need more time, more time. Because you can understand a judge and, I mean, I can understand, I should say, a judge in one of these judges is sitting there thinking, the clock is ticking. It's been literally years at this point, so I'm not going to give you any more extensions. But what, did he have a responsibility to ask for more Well, I think Not ask for more time, to ask for a different person. I think, I think there's a couple of responses that, Your Honor. First of all, Judge Irwin was committed to getting Mary Duran to the finish line in this case. PCR judge number one, he picked her. He stood by her, even when she was ill. And he asked Judge Matt Newman at one of the hearings, do you think we should replace her? And Matt Newman says, she's still sick. And Judge Irwin says, on the record, in the court hearing, I think we're going to stick with her because I think it'll take too much time to get a new person up to speed. So I think that was the mindset that Matt Newman had. And in fact, at the beginning of the evidentiary hearing, Matt Newman says to the judge, Judge, I don't know anything about mitigation development. I've only done a handful of these sorts of cases. I'm not a mitigation investigator. I wouldn't be sure what I'm even looking for. And so, and actually to take a step back, when Judge Irwin was first asked to get a mitigation specialist to Matt Newman, he said, I don't know anything about mitigation specialists. I'm going to have to call some judges in Phoenix and find out sort of what this is about, what these people do, whether that's something that the county needs to incur the expense for. So in fact, Judge Irwin didn't know. I don't think Matt Newman really knew what he was getting into either. So Judge, I think the answer to your question is, I think it may bother all of us if things dragged on as long as they did, but I'm not sure that Matt Newman either could supersede the work that Mary Duran had begun if she had actually done anything. I don't think Matt Newman was equipped to do it on his own, which we sometimes want to say it's the lawyer's fault. As Matt Newman said... That wasn't to be clear. That wasn't my question. I'm not saying could Matt Newman have stepped in. I'm wondering, did Matt Newman have an obligation at some point to say... To answer the question that at this point the judges had changed, but that Judge Irwin had asked him, which is, do we need to get a different person? And as I recall, he was kind of equivocal. He was like, I don't know. But later did he need to say, actually, we do need to get a different person. Judge, I agree with you. I think Matt Newman's response to Judge Irwin at that point was a bit equivocal. But it was also clear at the end of that hearing when Judge Irwin was doing sort of his soliloquy, right? And say, well, if we keep her, it's going to take more time. But if we replace her, somebody has to start from scratch on this thing. And as Mary Duran and Roseanne Shea said, you're looking at about probably 500, 700 hours of labor to conduct a proper mitigation investigation because you have dozens of people to interview, people in the defendant's life that have to be interviewed. The social history has to be developed. What do we know about what Mary Duran would have discovered or a competent mitigation specialist would have discovered had the work been done? Judge Fletcher, I think Mary Duran with her reputation at the time without the illness, I think her investigation likely nets what we did in the federal habeas corpus proceeding. We find evidence of organic brain damage in Daryl Lee related to cocaine withdrawal syndrome and progressive alcohol and cocaine intoxication. We find a diagnosis by Dr. Barry Morens, who teaches at the University of Arizona Medical School, of major depression, in part because when Daryl was 24, his 15-year-old brother was shot in the back of the head and during a home burglary, he was trying to steal marijuana from a place he knew to be marijuana dealers because he had a contemporary who was a son of the people that lived there. The kid gets shot in the back of the head. Daryl's 24 at the time. The kid is 15. Daryl spirals into severe cocaine and alcohol abuse after he'd been rehabilitated from his alcohol problem. And he spirals into this deep depression after that. And Dr. Barry Morens said, I missed the major depression because I didn't have a social history the first time that I saw Daryl and when I testified at the 2002 evidentiary hearing. And it's your contention that that evidence would have satisfied 2254E2A, is it rather B? I think, Judge Fletcher, that Matt Newman's diligence gets us over the opening clause of 2254E2A. He was diligent. He was trying to push this thing along. We get past that and we get to an evidentiary hearing under 2254E2A. So under Coleman, the failings of post-conviction counsel are attributable to the client under principles of agency law. Why isn't the mitigation investigator similarly an agent whose failures would be imputable to the client? In other words, even if Newman was totally fine, Durand clearly wasn't. So why isn't that also? You see the question. I understand what you're getting at, Judge Miller. I think the short answer is Michael Williams, the case Michael Williams makes a distinction between where counsel is deficient or negligent. He doesn't get something done. But then there's this discussion of whether somebody else is responsible for that not happening or something called happenstance, which the U.S. Supreme Court used. And I think that Mary Durand's illness, it doesn't relate to Matt Newman not doing a proper investigation or not raising the right issues in court or that sort of thing. It goes to the illness of somebody who at this point is on the defense team. So is your position then that if Newman had been ill, that that would satisfy this happenstance exception? I understand your argument from your briefing as to the investigator, but it's hard for me to see how your argument wouldn't also logically apply to the actual post-conviction counsel him or herself, right? That if they were sick or something like that and they didn't ask for a replacement or something, that that would be deemed happenstance and not attributable to the actual. I think that that probably would apply. I think that's a happenstance. It's not related to... Matt Newman's a really good lawyer. He later gets appointed to the bench in La Paz County and ends up becoming a judge out there. He's an honorable man. No, no. I know. So the reason I want to... It makes sense that if one would apply to the other. So your position is not, you know, inconsistent. But then would the counsel, if the counsel was sick and unable to perform, would the counsel have a... Because it is true that the lack of diligence by the counsel gets attributed to the person. Obviously the person being, the counsel being sick is maybe not attributable. But does the counsel have some obligation to say, I'm too sick. I need to have different post-conviction counsel appointed. I think that the judge who's monitoring this, Your Honor, would take a much closer look, I think, at what's going on in that relationship. If counsel can't make court hearings, can't produce pleadings, can't do things, I think at that point the judge is going to intercede. He may instruct counsel to file a motion of refusal. Maybe so, but does counsel have an obligation? Do you think counsel has a... Well, in this case, one of the arguments that Matt Newman made to the judge was at the first day of the evidentiary hearing, was that Mary Drant didn't recognize what her illness was. She couldn't tell me when she was going to be ready because she hadn't been for months and months. They couldn't even diagnose her until the repeated hospitalization. So if counsel suffered from something debilitating but couldn't tell the judge how long it's going to last, I think a judge probably goes along for a while with that, but then at some point the judge probably wants to move his docket along. Right? He probably is going to intercede and say, I'm taking you off. And even at the risk of setting the investigation back and the pleadings back, I'm appointing another lawyer in this case. A judge has that responsibility with regard to the counsel, maybe or maybe the judge doesn't, but why wouldn't a counsel have that responsibility for somebody that's working under or with the counsel? If a judge could spot and say, you know, this is not working out, and we would hold the judge to that standard, why wouldn't counsel have some standard to monitor and answer Judge Irwin's question or maybe answer it later and say, no, I do think we need to get a different mitigation person? I think, and Matt Newman represented this to Judge Irwin, that he didn't know how serious Mary Duran's illness was because she had not even been diagnosed yet. And so for months and months she, I think, was trying to fight through it. There was no determination for months and months, six months or a year, before it was determined that she had a mold infestation in her house that was causing her pneumonia. But two years in, two years in, maybe answer this question for me, is there any time Newman, even at the very end when he was, when the new post-conviction judge was denying his continuance and he had to go to the Arizona Supreme Court, was he asking for the investigator to be replaced? I don't remember seeing that. No, he was, I believe, Your Honor, that he was still, after that amount of time, I think, and because Mary Duran worked so hand-in-glove with Judge Irwin, Mary Duran was Judge Irwin's hand-picked person to do this. But there's a different post-conviction judge at this point, right? Right. But at that point, I don't think Judge Schaefer knew that relationship between Judge Irwin and Mary Duran. There's no indication that Judge Schaefer ever identified his understanding. Do we presume that the judge read every single minute entry and court proceeding transcript in this case? I wouldn't assume that. I mean, if we got to an evidentiary hearing, we certainly could put Judge Schaefer on the stand and ask him what he knew and why he didn't order Matt Newman to get a different mitigation specialist. Because it's not fair to Daryl Lee. Daryl Lee didn't do anything wrong, and yet there's a potential here for him to pay for those sins of the system, and I think the judiciary as well, as we're focusing on Matt Newman. But I think the judges had some responsibility to try to see that Daryl Lee got the appropriate resources in a capital case to get the thing to the finish line. And I think Judge Irwin was just committed to getting Mary Duran there, and then Judge Irwin retired in July of 2001, and Judge Schaefer came in, and there's certainly no request from Matt Newman at that point that a new mitigation person was going to be picked to replace Mary Duran. But Judge Schaefer, when he ultimately made his ruling, he said Matt Newman says that there's no support for his mitigation. Judge Schaefer says, I believe there was nothing there. That's why she didn't produce anything, because there was no evidence. And in retrospect, in light of what we did at the Federal Public Defender's Office, there was massive mitigation evidence that should have been produced to the mental health experts that would have changed the outcome of this case. Mr. Garrison, do you want to reserve? I do. I'll take the last two minutes, Judge. Thank you. We'll hear from the State. May it please the Court. My name is Laura Chase, and I represent respondents in this matter. I'd like to start by clarifying the case. She was ill in early 2001. On April 30, 2001, at a status conference, Mr. Newman informed the Court of the illness, said that Duran had moved out of the house and was feeling much better. On May 8, just a little more than a week later, Duran told the Court that she was back and working on the case, and she said she hadn't felt that good in 10 years. The evidentiary hearing was held almost a year later, in April of 2002. So I just wanted to clarify that. I also wanted to address Counsel's argument that he can now contradict his claims from earlier. I think she had pneumonia like five times or something like that. Wasn't that after? Wasn't that in that? So you're saying there was a year when she said she was feeling a lot better, and then there's another year, right, before he stopped granting continuances. But wasn't, I thought there was some testimony about her having pneumonia five times or something? I think that was prior to April 30. Was it? Okay. I thought it was maybe after, but I'm not sure. I don't. I created a little timeline of the status hearings, and the last mention of her illness that I could find was May 8, 2001, when she said she was feeling better. And then the evidentiary hearing was set for November 14 to 16, and ultimately held in April. And I just wanted to point out that as far as the argument that Mr. Lee can now contradict the argument, I'm sorry. So she had, I'm looking here, it says she had pneumonia five times at the status conference on May 8, 2001. So she reported that she had pneumonia. So that's before the April time frame you're talking about? Or is that? I believe so. I mean, it was certainly, she was recovered of those five times by May 8, which was just a week or so later than April 30. Thank you. Okay. I just wanted to point out that Mr. Lee in habeas made the argument that counsel was not diligent prior to Martinez ever being issued by the Supreme Court. So the argument that he can now reverse that, his position on that issue because Martinez no longer provides the avenue for an evidentiary hearing is not a valid argument. Because in the habeas Are you saying, is this some form of judicial preclusion that is simply precluded from making the argument? Well, what I'm saying is he argued differently below. No, I understand. That's exactly what you're saying. But I'm asking you what consequence you think we should attach to that. Are you saying that he is precluded from making the argument he's making today? I think the court should consider that, I don't know that he would necessarily be precluded from making the argument, but it certainly is, I think. Well, the underlying facts are the underlying facts. Correct. And he makes an argument going one direction, and now he makes an argument going the other direction. Right. But I don't see that the facts have changed. Correct. And the fact is, was counsel diligent and he argued? No, I understand that he made a different argument, but I'm trying to figure out what your argument is as to the consequence of his changing the argument. You seem to be wanting us to say, well, you know, he can't make it today. And I'm asking you, are you saying he's precluded and you're hedging? Is he precluded from making the argument today that he's now making it because it's inconsistent with an argument he made before? I think he should be because the district... And what's your authority for that? The district court, I'm sorry, I don't have specific authority. There is, I did cite in my brief... In judicial preclusion, I mean, it's a doctrine. There are certain requirements you have to have. And you're arguing that he's precluded. But if you don't have case law, because I don't think he is precluded, it doesn't help him that he made an earlier argument to the contrary. But I don't think he's precluded. And unless you give me case law that tells me why he is precluded, I think I'm going to consider the argument. I cited in my brief, and I apologize, I don't remember the name of the case, a Ninth Circuit case that precludes a party from making an argument for the first time on appeal. And that is what Mr. Gabrielson is doing here. Well, but the intervening case law has changed. It changed and then it changed back. The intervening case law was Martinez and Ramirez, but he made his argument before Martinez and Ramirez were issued. And he argued in his habeas petition that counsel's failures should not be attributed to him because they were ineffective, basically. He did not argue that counsel were diligent and that they were prevented from investigating. He argued that they were, that counsel failed and those failures should not be attributed to him. And I think the court should certainly consider that if he's not precluded from making a new argument on that factual issue, it should certainly consider that in determining the weight of his argument and the going back and forth on that. So suppose, I mean, suppose we excuse the forfeiture or waiver and suppose that we think that Newman did the best that he could under the circumstances where he has this person foisted upon him who then has the problems she has and doesn't do her job and that really the failing was on Duran's part. What would follow from that in your view? That the failing was on... Suppose that we conclude that Newman did all he could and like Duran failed to do her job adequately because of her illness. What conclusions would follow? Well, I don't think there's a, as far as attributing conduct to Lee, I don't think there's a difference between counsel and the mitigation specialist. But as the district court held, both of those, the conduct of both of those individuals and indeed the entire defense team, any investigators, would be attributed to Mr. Lee in that circumstance. And so that's a lack of diligence and an evidentiary hearing would be precluded. And what's the statutory language that governs our determination of due diligence? The statutory language is in E2. It's failed to develop. Is that... No, it says unless the applicant shows that the claim relies on a factual predicate that could not have been previously discovered through the exercise of due diligence. That's the language. It doesn't specify as to whom. So that is... And I see this as an argument in your favor. Correct. I believe that that's the... But it's written here in the passive sentence. It's not saying a responsibility of counsel. It just says couldn't have been discovered. Correct. Correct. And that was the portion you read, I believe, is what applies if he can't establish diligence. So that's why we haven't focused on that because we've been focused on diligence. And correct, I don't believe either of the subsections of E2 would apply if he can't establish diligence to get himself out of E2. And I just want to point out that the court granted the extensions on the evidentiary hearing that Lee requested. The only one it didn't grant was the one made on the first day of the evidentiary hearing. And the evidentiary hearing was held, it began, on the day that Lee requested. It was stayed by the Arizona Supreme Court until April 16th, which was the day Lee wanted the evidentiary hearing to start. Excuse me. And it was sort of a moving target, Ms. Duran's statements about the progress of her investigation. In February of 2001, counsel said they needed three to six months to complete the investigation. Granted, Ms. Duran became ill at some point during that time. But on April 30th, she was feeling better and had hired an assistant to help her with the interviews. On June 25th, she stated that she had interviewed the parents, had located other witnesses to interview, and was planning to do that. On September 28th, and I want to say in May of 2001, she also said that the investigation would be completed by the end of summer. But in September, she said she needed another three to four months. So it was sort of a moving target. They were not being transparent to the court if they truly believed they were. Nor counsel informed the court of that. Instead, Duran gets up at the evidentiary hearing and testifies that she didn't have enough time. And she did have the time. She did have the resources. As Lee in his habeas petition pointed out, that Mr. And was budgeted 400 hours at $75 an hour. And he specifically said in the habeas petition that she had sufficient resources. The only resource that was denied was the request for an investigator. I guess I never saw this. What did Durant end up getting? Like how much did Durant do in 400 hours? I don't know. Yeah. I just never saw that. I don't know how much she actually ended up billing, Your Honor. The only resources that were denied was a request for an investigator to investigate the trial counsel's substance abuse. The court denied that, saying that she had had a year to do that. And they had, in fact, been investigating his performance at trial for all that time. And then the other request that was denied was a request to investigate the trial. Neither of those requests would have yielded the information Lee is now saying should have been presented. So even if counsel was diligent in requesting those resources, those are not the resources he needed or that would have yielded the information on Lee's background and diagnoses that would have made the different . . . that Lee is now saying should have been presented. Let me ask a question about . . . I'm trying to figure out what the State's position is. If you had an investigator, and that investigator, either through something completely outside the investigator or anybody else's control, say got a really serious mental illness or something and just couldn't do their work, and somehow that prevented them from reporting back that they were unable to do their work also, or malfeasance, the investigator's just taking the money and going to Hawaii or something like that, and not . . . Is your position that . . . I know your position is that the lack of diligence of investigators should be imputed back. But in that sort of situation, do you think the lack of diligence would be imputed back? I mean, because I think if an attorney completely abandoned somebody and just . . . then usually you wouldn't attribute that, right? We have the abandonment doctrine if the person's genuinely abandoned. I think that's correct. And so would you think that a similar type thing would be true for an investigator if they were . . . I'm not saying that that's the case, but I'm just trying to think through this. I think that could be. It all depends on the circumstances, but I think it could be. Okay, so let me . . . if we assume that that possibly could be, and I don't know whether it could or not, but if we assume it could be, and let's assume, for the sake of argument, but I'm not asking you to concede this, but that that's what happened here, that the sickness was just something that was out of anybody's control. What is your position as far as the responsibility of the attorney, right? Is there . . . does the attorney have some responsibility, and where do you think the attorney should step in? Absolutely. I think the attorney is in charge of the team and has responsibility to ensure that the team is doing their job. And if someone on the team is unable to do . . . for whatever reason, then I think the attorney has the obligation to replace that person or bring it to the court's attention, whatever is needed to do to correct it. So I think Petitioner's Counsel's position is, well, the judge has a responsibility, too. The judge is part of this. What is your response to that? Well, I think the judge needs to be made aware. If the judge is going to have any responsibility to take action, the judge needs to be aware that action needs to be taken. And in this case, after May 8th of 2001, there was no indication that anything was hindering the investigation. In fact, they reported to the court that the investigation was proceeding. And so I don't see in this case how the court would have had any reason to intervene at all.  Thank you very much. By saying that all of the new evidence, as the district court found, all of the new evidence that Mr. Lee presented in habeas is cumulative of what was presented in state court. And so even if the court considered the new evidence, the district court did not abuse its discretion, even if it was not prohibited from having an evidentiary hearing. The district court didn't abuse its discretion by not holding one because the hearing would not have assisted Mr. Lee in proving his claims because the evidence was cumulative of what was presented in state court. If the court has no further questions, I would just ask that it affirm the district court's ruling. Thank you. Thank you. Your Honors, I'll take that last point first. The evidence that we would present at an evidentiary hearing is in no way cumulative of what happened in state court. And good proof of that is the fact that even Mr. Politti, the trial attorney, tried to get an addiction medicine expert, Dr. Anatolio Munoz from Tucson. He wanted him to go to Parker to the jail to see Daryl Lee. Dr. Munoz said, I don't fly in puddle jumper airplanes. I'm not, there's no way I'm getting on one of those to go out there. You're going to have to find somebody else. So did Politti like look around, try to find somebody else? Addiction medicine is different than psychology or psychiatry. Did he find somebody else? Did he attempt? No. He just dropped it. He just dropped it. And he testified to that at the evidentiary hearing when he said Dr. Munoz wouldn't fly and I didn't get anybody else. There was a recognition by Politti, I think he was on the right track. He needed somebody like Dr. Murray Smith, our expert from Vanderbilt University in Nashville, a real addiction medicine expert who understands the effects on brain chemistry that both alcohol and cocaine cause, but especially the organic brain damage that withdrawal from cocaine does because it alters the brain chemistry. This isn't just, I'm afraid Judge Erwin in sentencing thought this is a recreational drug user who was hell bent on robbing somebody to get money for cocaine. That's not at all what it was. It misstates the nature of what Daryl Lee's addictions were and what the effects are because cocaine withdrawal syndrome and progressive alcohol and cocaine intoxication, those are organic. Those cause chemical changes in the brain that a defendant would be powerless, powerless, especially the withdrawal syndrome, to resist. And so to suggest that the evidence was cumulative, it was not in any way cumulative. The other thing is, and I think the court, the district court addressed this in its opinion, said, yeah, I didn't hear any evidence about depression, but that wouldn't make a difference in what my ruling is today. And yet Dr. Barry Morenz, when he got the social history, he said major depression going back to childhood. He also said no conduct disorder as a juvenile that would lead anybody to diagnose antisocial personality disorder, which was a critical diagnosis in the post-conviction proceeding to defend against Dr. Morenz's testimony that he now had more information and would have found depression. That's a different diagnosis. Thank you, Your Honor. I appreciate the time. Are you giving me more time? No, I think we have your argument. Yes. The other thing is, and what's critical here is, the sentencing court was not aware of Darrell's spiral into cocaine and alcohol addiction after his younger brother Ted was shot in the back of the head and the family was upset because the homeowner was not prosecuted. You are over your time. I think we have your argument. I appreciate that, Your Honor. Thank you. Thank you, Mr. Gabrielson. We thank you and Ms. Chason for your helpful arguments this morning. The case is submitted.
judges: FLETCHER, MILLER, VANDYKE